# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### August 16, 2011 Session

## STATE OF TENNESSEE v. ZACHERIAH HOLDEN

**Appeal from the Circuit Court for Warren County**
**No. F-11837   Larry B. Stanley, Judge**

---

**No.  M2010-00811-CCA-R3-CD - Filed March 8, 2013**

---

Appellant, Zacheriah Holden, was indicted by the Warren County Grand Jury for over thirty offenses as a result of a drunk driving accident in which two people were killed.  He pled guilty to several offenses before trial and was found guilty of the remaining charges.  After the proper merger of offenses, Appellant's convictions were two counts of aggravated vehicular homicide, one count of reckless endangerment, driving on a revoked license, evading arrest, resisting arrest, leaving the scene of the accident, five counts of failure to render aid, failure to obey a traffic device and violation of the financial responsibility law. The trial court sentenced Appellant to an effective sentence of thirty years and eight months. Appellant appeals his convictions and his sentences.  Appellant raises several issues on appeal.  He argues that: (1) the trial court erred in denying his request for change of venue; (2) the trial court erred in denying his request for sequestration of the jury; (3) the trial court erred in denying Appellant's various motions to suppress his statements to law enforcement and his seizure in a car; (4)the trial court erred in denying his motion to exclude the testimony of the State's accident reconstructionist as an expert witness; (5) the trial court erred in allowing the State to present a photograph of the victims' car; (6) the trial court erred in failing to sever DUI, fourth offense from aggravated vehicular homicide; (7) the trial court erred in excluding the testimony of Travis Battles who was going to testify to updates to the traffic light since the accident; (8) the State did not sufficiently prove the chain of custody of Appellant's blood sample submitted for blood alcohol testing; (9) the evidence was not sufficient to support his convictions; (10) the sentencing scheme for aggravated vehicular homicide is unconstitutional; (11) the trial court erred in imposing the length of his sentences, as well as imposing consecutive sentences; and (12) the trial court erred in its evidentiary rulings on various pieces of evidence.  We have thoroughly reviewed the record on appeal and conclude that the issues raised do not warrant reversal of the judgments below. Therefore, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court are Affirmed**

JERRY L. SMITH, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and DONALD P. HARRIS, SR. J. , joined.

C. Brent Keeton, Manchester, Tennessee, for the appellant, Zacheriah Holden.

Robert E. Cooper, Jr., Attorney General and Reporter; Lindsy Paduch Stempel, Assistant Attorney General; and Lisa Zavogiannis, District Attorney General, for the appellee, State of Tennessee.

## OPINION

### *Factual Background*

On July 7, 2008, Appellant and his girlfriend, Heather Heck, began their day by loading his son and her son into Appellant's white Chevrolet Blazer. Their first stop was a Wal-Mart where Appellant purchased a case of beer. Appellant drove to Manchester, Tennessee and took the boys swimming in a nearby creek. After swimming, Appellant drove his girlfriend and the children to the home of Kenneth Maynard. They arrived at Mr. Maynard's home around 3:30 or 4:00 p.m. Mr. Maynard testified that Appellant entered his house with a beer in his hand.

About an hour later, Appellant, Ms. Heck, the children, and Mr. Maynard drove to visit Mr. Maynard's mother, Vicky Durham. On the way to her house, they stopped at a bridge 50 to 60 feet above the stream below. Appellant saw several teenagers jump off the bridge, and he decided to do the same. According to Ms. Heck, after the jump, Appellant was complaining about his neck. Appellant, Ms. Heck, and Mr. Maynard arrived at Ms. Durham's house where they continued to drink.

When they left Ms. Durham's house, the group decided to stop at the grocery store to purchase food for a cook-out. Appellant was driving. They returned to Mr. Maynard's house and cooked on the grill. Mr. Maynard testified that the adults continued to drink while preparing the food. Ms. Heck testified that they all drank Kool-Aid, but Mr. Maynard said that the adults continued to drink alcohol after the children went to bed. Mr. Maynard testified that he believed that Ms. Heck, Appellant, and the children were going to spend the night at his house. When he went to bed, at 9:30 p.m., Ms. Heck was asleep on the couch. Mr. Maynard was awakened the next morning by Ms. Durham beating on his door. She had heard that Appellant was involved in an accident, and Ms. Durham wanted to see if Mr. Maynard also was involved.

Pamela Lawson testified she was returning home to McMinnville from Manchester on the evening in question. As she left Manchester, she noticed a car approaching quickly from behind. The car "got right up on [her] bumper." She moved over so that the car could pass her. She noticed that the car was a white Chevrolet Blazer. After the Blazer passed her, she continued to Morrison. When she arrived at the red light in Morrison, she saw some traffic congestion and realized that there had been an accident. She saw the white Blazer sitting on the side of the road. Ms. Lawson stated that she traveled that road every day and had never noticed a problem with the Morrison traffic light.

At around 10:50 p.m. on July 7, 2008, Kimberly Shea Miller and her brother, Noah Drake were returning home from a friend's house. As they approached the intersection at Highways 55 and 287, they stopped at the Morrison red light. They noticed a white Blazer coming from the opposite direction towards them. Ms. Miller testified that she noticed the Blazer because the stop light was red, and she thought the vehicle was traveling too fast as it approached the red light. She was turning right, and as she was turning, she saw another car enter the intersection. Mr. Drake said that he also saw a car turning into the intersection as Ms. Miller made her turn. After she turned, they both heard a "huge crash." Mr. Drake saw the cars slide through the intersection.

That same evening, Rayford and Vada Elam, the victims, were returning home from their great-grandchild's baseball game. Their car was in the intersection when Appellant collided with their vehicle.

Ms. Miller turned into a nearby parking lot at Hullett's gas station, and she and Mr. Drake ran to the crash. Ms. Miller ran to the white Blazer in the intersection, and Mr. Drake ran to the car in the ditch. When she got to the white Blazer, a man got out of the driver's side and said, "check my kids." He also told her to call 911. Ms. Miller identified Appellant as the man who got out of the vehicle. She did not know where he went after that, but she said that he left the scene. She looked in the car and saw a woman in the passenger seat and two children in the backseat. Ms. Miller ran to the other car, that was in the ditch, and saw a man and a woman. They did not respond when she spoke to them. She testified that it was obvious to her that they were dead or unconscious.

Mr. Drake first ran to the car that ended up in the ditch. He found two people in the car, and he stated that he could tell that they were deceased. He ran back to the white Blazer and saw the driver "stumble" out of the car. The driver said, "check on my babies." Mr. Drake stated that the driver had on a green shirt and shorts. He did not see the driver again.

Lisa Davidson, Jennifer Wright, and Chad Wright were meeting at Hullett's gas station after returning from a swim meet on July 7, 2008. When Ms. Davidson pulled out of the gas station parking lot, she noticed a car coming really fast towards the intersection, so she instinctively stayed in the turn lane. She saw that the nearby stop light was red. As she turned, she heard a crash and immediately turned back into the parking lot. She attempted to call 911 because several other people ran to the two vehicles involved. She was unable to reach 911 and went to the Blazer. She saw a woman and two children in the Blazer. She never saw a driver. She went to the other car involved and immediately determined that the two occupants were dead.

Mr. and Mrs. Wright also witnessed the accident. Mrs. Wright pulled into Hullett's parking lot. After she parked, a man approached her and asked her to call 911. She replied that her son was calling 911. The man walked toward her car, and she followed him because her children were alone in her car. The man asked her son if he had called 911. He responded that he was on the telephone with 911 at that time. Mrs. Wright did not see the man again. When she arrived at the Blazer, there was no one in the driver's seat. Mr. Wright testified that he saw the white Blazer hit the car. He saw the other car go into a ditch and saw the white Blazer slide to a stop. Mr. Wright went to check on the Blazer. There was no driver in the vehicle. However, he recalled that he saw a man running across the highway saying someone should call 911. At the time, Mr. Wright thought that it had been a bystander.

Heather Roach was coming home from a softball game on the evening in question when she reached the site of the accident. She pulled up near the accident and saw a man wearing a green shirt get out of the Blazer. She asked if everyone was okay, and he said no. She turned around, and when she turned back to the man, he was running from the scene. At trial, Ms. Roach identified Appellant as the man wearing a green shirt that she saw get out of the Blazer.

When emergency personnel arrived, they confirmed that the two victims in the car in the ditch were dead. They noticed the driver's side door of the Blazer was standing open. The passenger and two children were examined. One child was flown out on lifelight. The passenger and other child were taken to the hospital by ambulance.

The night in question, June Jones had been shopping with her daughter. She was returning home and noticed some police officers standing in the road. She slowed down to stop, but the officers motioned her to keep going. She turned down Jacksboro Road. She saw a younger man waving at her to stop. She thought he might be in trouble, so she pulled over and rolled down the window to ask him if he was alright. He opened the car door and got inside. He told Ms. Jones that he needed a ride up the road. After driving a short way

up the road, she asked if he needed to be let out. She testified that it was clear that the man did not know where he was. About that time, an officer pulled her over. An officer approached her car and took Appellant from her car and placed him in the patrol car. At trial, Ms. Jones identified Appellant as the person who got into her car.

Warren County Sheriff's Deputy Brad Myers was searching for the driver of the white Blazer. He was on Jacksboro Road when he noticed a car pulled over on the side of the road. Deputy Myers saw a person get into the car. Because he had received a call that the driver of the Blazer had been seen walking on Jacksboro Road, Deputy Myers pulled the car in question over onto the side of the road. At trial, Deputy Myers identified the individual in the car as Appellant. Deputy Myers got Appellant out of the car and noticed that Appellant smelled of alcohol, had slurred speech, and had red, glazed eyes. Deputy Myers opined that Appellant "appeared to be impaired or intoxicated on some substance."

Deputy Myers placed Appellant in the rear of his patrol car and returned to Ms. Jones in order to get a statement from her. Deputy Myers looked back at his patrol car and saw Appellant, still in handcuffs, running away from the patrol car. Deputy Myers and other officers ran after Appellant across a bean field. Deputy Myers tackled Appellant and apprehended him after chasing him for about 200 yards. When Appellant was apprehended he was very combative. An officer informed Appellant that he had killed two people in the accident, and Appellant responded that he "didn't give a fuck." When the officers returned to the patrol car, they informed Appellant of his *Miranda* rights. In reply, Appellant said, "Fuck you."

Appellant was returned to the scene of the accident. Trooper Marty Terry, with the Tennessee Highway Patrol, interviewed him. He said that Appellant was wearing a green shirt and shorts. Appellant admitted that he had been driving the white Blazer. Appellant told Trooper Terry that the victims had pulled out in front of him while he was driving down the road. Trooper Terry asked Appellant where he was. Appellant said that he was on State Route 64 in Lincoln County. When asked how much he had to drink, Appellant responded that he had consumed three to five beers. He did not recall any passengers being in the Blazer with him. Appellant told Trooper Terry that he ran from the scene because he "heard the cops coming." Trooper Terry asked Appellant to take some field sobriety tests. Appellant responded that he would not be able to complete them. Trooper Terry testified that Appellant's assessment of his ability was correct. Appellant was unable to successfully complete the tests.

Trooper Terry inventoried Appellant's vehicle. He found multiple, empty Bud Light cans in the Blazer. Trooper Terry found Appellant's billfold in a pair of blue jeans. The billfold did not contain a driver's license. Instead, it contained a card that is like a driver's

license but is for identification only. The blue jeans also contained a bag in the watch pocket. When Trooper Terry looked at the contents of the bag, he concluded that the substance appeared to be marijuana. Trooper Terry sent the contents of the bag to the Tennessee Bureau of Investigation ("TBI") lab. After advising Appellant of his *Miranda* rights, Trooper Terry asked Appellant about the marijuana, and Appellant admitted that it was marijuana and that it belonged to him.

Trooper Randy Maynard, with the Tennessee Highway Patrol, transported Appellant to River Park Hospital. Trooper Maynard explained the implied consent form to Appellant, and Appellant appeared to understand the form. Appellant agreed to a blood test.

The laboratory assistant who drew Appellant's blood testified at trial that she could smell alcohol on Appellant. She stated that he appeared to be intoxicated. She drew Appellant's blood at 12:56 a.m. on July 8, 2008. This was roughly two hours after the accident. The results of the toxicology report on this sample was a blood alcohol content of 0.21. A forensic toxicology expert, Dr. Kenneth Ferslew, testified at Appellant's trial that Appellant's maximum blood alcohol content would have been 0.249, based upon the 0.21 result two hours after the incident. Dr. Ferslew stated that this level of intoxication would result in "psycho motor impairment" which in reference to driving would affect reaction times and change ones perception of environment, speed, distance, and time.

Dr. Nigel Fontinal was on duty as an emergency room physician the night of the accident. He treated Appellant at 1:10 a.m. on July 8, 2008. Dr. Fontinal testified that Appellant appeared intoxicated, but he was cooperative during the physical examination. Appellant complained that he "hurt all over" and specifically stated that his knee hurt. Dr. Fontinal ordered an x-ray, but he did not find any significant injuries. He also testified that he found no signs of head trauma with regard to Appellant. Dr. Fontinal also treated Ms. Heck, Appellant's girlfriend. She had a one and a half inch long laceration on her head that had to be closed with staples. For that reason, Dr. Fontinal was concerned about head trauma. He ordered several tests, the results of which were all normal. Dr. Fontinal also treated four-year-old Hunter Holden, who was a passenger in the car driven by Appellant. Hunter had some abrasions and bruising, but he was not seriously injured. At 2:45 a.m., the bodies of the victims arrived at the hospital where Dr. Fontinal drew blood samples from both victims.

The Warren County Grand Jury indicted Appellant for four counts of vehicular homicide; five counts of reckless endangerment; two counts of driving under the influence, fourth offense; driving while license cancelled, suspended or revoked, third offense; evading arrest; resisting stop, frisk, halt, arrest, or search; leaving the scene of an accident involving death or personal injury; simple possession or casual exchange; five counts of violation of

the duty to give information and render aid; failure to obey any required traffic-control device; violation of the financial responsibility law; and eight counts of aggravated vehicular homicide.

Appellant pled guilty before trial to driving while license cancelled, suspended, or revoked, third offense; evading arrest; resisting arrest; simple possession; and five counts of violation of the duty to give information and render aid. At the conclusion of a jury trial, the jury found Appellant guilty of two counts of vehicular homicide; two counts of reckless homicide; five counts of reckless endangerment; two counts of driving under the influence, third offense; leaving the scene of an accident involving death or personal injury; failure to obey any required traffic-control device; violation of the financial responsibility law; and six counts of aggravated vehicular homicide. The trial court merged all five convictions for reckless endangerment into one count. The trial court also merged the convictions of vehicular homicide, reckless homicide, and DUI, third offense, and all but one of the convictions of aggravated homicide into one conviction of aggravated vehicular homicide for each victim. Therefore, for sentencing purposes, the trial court sentenced Appellant for two convictions of aggravated vehicular homicide and one conviction for reckless endangerment, as well as his other convictions. Appellant's effective sentence was thirty years and eight months. Appellant appeals both his convictions and his sentences.

## Change of Venue

Appellant argues that the trial court erred in denying his pre-trial motion for a change of venue. His motion was based upon the media publicity in the community connected with his case. The State argues that Appellant has not shown that any jurors were biased or prejudiced against him and, therefore, the trial court did not err.

A change of venue may be granted "when a fair trial is unlikely because of undue excitement against the defendant in the county where the offense was committed or for any other cause." Tenn. R. Crim. P. 21(a) (2006). A motion for change of venue is left to the sound discretion of the trial court, and the trial court's ruling will be reversed on appeal only upon a clear showing of an abuse of that discretion. *State v. Howell*, 868 S.W.2d 238, 249 (Tenn. 1993); *State v. Hoover*, 594 S.W.2d 743, 746 (Tenn. Crim. App. 1979). The mere fact that jurors have been exposed to pretrial publicity will not warrant a change of venue. *State v. Mann*, 959 S.W.2d 503, 531-32 (Tenn. 1997). Similarly, prejudice will not be presumed on the mere showing of extensive pretrial publicity. *State v. Stapleton*, 638 S.W.2d 850, 856 (Tenn. Crim. App. 1982). In fact, jurors may possess knowledge of the facts of the case and may still be qualified to serve on the panel. *State v. Bates*, 804 S.W.2d 868, 877 (Tenn. 1991). Before a conviction will be overturned on a venue issue, the appellant must demonstrate on appeal that the jurors were biased or prejudiced against him. *State v. Melson*,

638 S.W.2d 342, 360-61 (Tenn. 1982). The test is whether the jurors who actually sat on the panel and rendered the verdict and sentence were prejudiced. *State v. Kyger*, 787 S.W.2d 13, 18-19 (Tenn. Crim. App. 1989). This Court has quoted the United States Supreme Court stating the following:

> "[E]xtensive knowledge in the community of either the crimes or the putative criminal is not sufficient by itself to render a trial unconstitutionally unfair," and the court may not presume unfairness based solely upon the quantity of publicity "in the absence of a 'trial atmosphere . . . utterly corrupted by press coverage.'"

*State v. Crenshaw*, 64 S.W.3d 374, 387 (Tenn. Crim. App. 2001) (quoting *Dobbert v. Florida*, 432 U.S. 282, 303, 97 S. Ct. 2290, 53 L. Ed. 2d 344 (1977) (quoting *Murphy v. Florida*, 421 U.S. 794, 798, 95 S. Ct. 2031, 53 L. Ed. 2d 344 (1975))). The burden of proof is on the defendant to show that the jurors were biased or prejudiced against him. *Id.* at 394; *see also State v. Blackwell*, 664 S.W.2d 686, 689 (Tenn. 1984); *State v. Garland*, 617 S.W.2d 176, 187 (Tenn. Crim. App. 1981).

> We have also stated:

> Furthermore, the scope and extent of voir dire is left to the sound discretion of the trial court. *State v. Smith*, 993 S.W.2d 6, 28 (Tenn.1999). Jurors who have been exposed to pretrial publicity may sit on the panel if they can demonstrate to the trial court that they can put aside what they have heard and decide the case on the evidence presented at trial. *State v. Gray*, 960 S.W.2d 598, 608 (Tenn. Crim. App. 1997).

*State v. William Glenn Rogers*, No. M2002-01798-CCA-R3-DD, 2004 WL 1462649, at *19 (Tenn. Crim. App., at Nashville, Jun. 30, 2004), *reh'g denied*, (Tenn. Aug. 27, 2004).

Relevant factors to consider in determining whether to grant a motion for a change of venue include: (1) nature, extent, and timing of pre-trial publicity; (2) nature of publicity as fair or inflammatory; (3) the particular content of the publicity; (4) the degree to which the publicity complained of has permeated the area from which the venire is drawn; (5) the degree to which the publicity circulated outside the area from which the venire is drawn; (6) the time elapsed from the release of the publicity until the trial; (7) the degree of care exercised in the selection of the jury; (8) the ease or difficulty in selecting the jury; (9) the veniremen's familiarity with the publicity and its effect, if any, upon them as shown through their answers on voir dire; (10) the defendant's utilization of his peremptory challenges; (11) the defendant's utilization of his challenges for cause; (12) the participation by police or by

prosecution in the release of publicity; (13) the severity of the offense charged; (14) the absence or presence of threats, demonstrations or other hostility against the defendant; (15) size of the area from which the venire is drawn; (16) affidavits, hearsay, or opinion testimony of witnesses; and (17) nature of the verdict returned by the trial jury. *Hoover*, 594 S.W.2d at 746.

For there to be a reversal of a conviction based upon a claim that the trial court improperly denied a motion for a change of venue, the "defendant must demonstrate that the jurors who actually sat were biased or prejudiced against him." *State v. Evans*, 838 S.W.2d 185, 192 (Tenn. 1992) (citing *State v. Burton*, 751 S.W.2d 440, 451 (Tenn. Crim. App. 1988)).

Consequently, we must examine the impartiality of the trial jurors in the case herein. The trial court gave each person on the jury venire a questionnaire to complete. Potential juror members who indicated that they knew the parties or knew of the case were called into the trial judge's chambers for questioning by both the State and Appellant. The trial court allowed a thorough voir dire of potential jurors by attorneys for both Appellant and the State. Fifteen of the potential jurors indicated that they had some knowledge of the case from the newspaper. Only one of the fifteen jurors indicated he had a bias based upon the newspaper. The trial court excused that juror from service. The remaining jurors claimed to have no preconceived opinion on the guilt or innocence of Appellant. Appellant has provided no evidence of bias other than his assertions that the media coverage created bias in the jury. Appellant failed to show that the jury was actually biased or prejudiced against him. We determine that the trial court did not abuse its discretion in denying the motion for change of venue. Appellant is not entitled to relief on this issue.

### Sequestration of Jurors

Appellant argues on appeal that the trial court erred in denying his motion requesting the sequestration of the jury. The State argues that the trial court did not err in denying this motion.

Our criminal code provides that "[i]n all criminal prosecutions, except those in which a death sentence may be rendered, jurors shall only be sequestered at the sound discretion of the trial judge, which shall prohibit the jurors from separating at times when they are not engaged upon actual trial or deliberation of the case." T.C.A. § 40-18-116. A trial court's denial of a request for sequestration of the jury is reviewed on an abuse of discretion basis. *See State v. John Fred Howard*, No. W2008-00208-CCA-R3-CD, 2009 WL 1034506, at *8 (Tenn. Crim. App., at Jackson, Apr. 17, 2009), *perm. app. denied*, (Tenn. Sept. 28, 2009).

At the hearing on Appellant's motion to sequester, the trial court stated the following:

The issue of sequestration I will probably also deal with after we get the jury, while we're picking the jury and find out how much they claim to know and so forth. If we get a jury from here it may be that I grant that request. I think it is certainly within my discretion and I would probably come as close to granting that in this case as I would in any.

The trial court subsequently filed an order holding the issue in abeyance until the jury was selected. Other than the pre-trial motion, we have been unable to locate any other occasion where Appellant requested the sequestration of the jury. At the hearing on the motion for new trial, the trial court stated with respect to sequestration, "I didn't see any problem with them going home at night. All of the jurors were warned not to listen to the news, not to read the newspaper and I don't find that any of them were affected by not being sequestered."

Our review of the record leads us to the conclusion that the trial court did not abuse its discretion in denying Appellant's request for a sequestered jury. The trial court was aware of the media stories concerning Appellant. The trial court conducted individual voir dire to examine the jurors who admitted on the questionnaire that they knew of the accident from news coverage. The trial court and the parties asked questions to determine whether the potential jurors who had read the news stories could remain objective and fair. The trial court dismissed the one juror who stated he could not be impartial and appeared to be biased by pretrial publicity. The trial court admonished the jury to steer clear of media coverage of the trial. There was no indication that the jury was exposed to any media coverage during the trial. There is no evidence in the record that the jury engaged in any improper extraneous communications with non-jury members.

In light of these facts, we cannot find any prejudice suffered by Appellant as a result of the trial court's denial of his motion to sequester the jury. Under these circumstances, the trial court did not abuse its discretion in denying Appellant's request that the jury be sequestered.

## Motions to Suppress

Appellant argues that his incriminating statements to police should be suppressed as well as the result of his blood alcohol test.

"This Court will uphold a trial court's findings of fact in a suppression hearing unless the evidence preponderates otherwise." *State v. Hayes*, 188 S.W.3d 505, 510 (Tenn. 2006)

(citing *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996)).  On appeal, "[t]he prevailing party in the trial court is afforded the 'strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence.'"  *State v. Carter*, 16 S.W.3d 762, 765 (Tenn. 2000) (quoting *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998)).  "Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact."  *Odom*, 928 S.W.2d at 23.  Our review of a trial court's application of law to the facts is de novo, with no presumption of correctness.  *State v. Walton*, 41 S .W.3d 75, 81 (Tenn. 2001) (citing *State v. Crutcher*, 989 S.W.2d 295, 299 (Tenn. 1999); *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997)).  When the trial court's findings of fact are based entirely on evidence that does not involve issues of witness credibility, however, appellate courts are as capable as trial courts of reviewing the evidence and drawing conclusions, and the trial court's findings of fact are subject to de novo review.  *State v. Binette*, 33 S.W.3d 215, 217 (Tenn. 2000).  Further, we note that "in evaluating the correctness of a trial court's ruling on a pretrial motion to suppress, appellate courts may consider the proof adduced both at the suppression hearing and at trial."  *State v. Henning*, 975 S.W.2d 290, 299 (Tenn. 1998).

Suppression of Statements

Appellant argues that the trial court erred in denying his motion to suppress his statements made both at the scene and two hours later at the hospital.  Appellant argues he was too intoxicated to understand his *Miranda* rights, and therefore did not freely and voluntarily make his statements to police.

The Fifth Amendment to the United States Constitution provides in pertinent part that "no person . . . shall be compelled in any criminal case to be a witness against himself."  U.S. Const. amend. V.  Similarly, Article I, Section 9 of the Tennessee Constitution states that "in all criminal prosecutions, the accused shall not be compelled to give evidence against himself."  Tenn. Const. art. I, § 9.  However, an accused may waive this right against self-incrimination.  *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).  The Supreme Court held that a suspect may knowingly and intelligently waive the right against self-incrimination only after being apprised of these rights.  *Id.* at 479.  Accordingly, for a waiver of the right against self-incrimination to be constitutionally valid, the accused must make an intelligent, knowing, and voluntary waiver of the rights afforded by *Miranda*.  *Id.* at 444.  In considering the totality of the circumstances a court should consider:

> [T]he age of the accused; his lack of education or his intelligence level; the extent of his previous experience with the police; the repeated and prolonged

-11-

nature of the questioning; the length of the detention of the accused before he gave the statement in question; the lack of any advice to the accused of his constitutional rights; whether there was an unnecessary delay in bringing him before a magistrate before he gave the confession; whether the accused was injured intoxicated or drugged, or in ill health when he gave the statement; whether the accused was deprived of food, sleep or medical attention; whether the accused was physically abused; and whether the suspect was threatened with abuse.

*State v. Huddleston*, 924 S.W.2d 666, 671 (Tenn. 1996) (quoting *People v. Cipriano*, 429 N.W.2d 781 (Mich. 1988)). However, no single factor is necessarily determinative. *State v. Blackstock*, 19 S.W.3d 200, 208 (Tenn. 2000) (citing *Fairchild v. Lockhart*, 744 F.Supp. 1429, 1453 (E.D. Ark. 1989)). Further, "[a] trial court's determination that a confession was given knowingly and voluntarily is binding on the appellate courts unless the defendant can show that the evidence preponderates against the trial court's ruling." *State v. Keen*, 926 S.W.2d 727, 741 (Tenn. 1994).

A court may conclude that a defendant voluntarily waived his rights if, under the totality of the circumstances, the court determines that the waiver was uncoerced and that the defendant understood the consequences of waiver. *State v. Stephenson*, 878 S.W.2d 530, 545 (Tenn. 1994). In order to be considered voluntary, the statement "must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence." *State v. Kelly*, 603 S.W.2d 726, 727 (Tenn. 1980)(quoting *Bram v. United States*, 168 U.S. 532, 542-43, 18 S. Ct. 183, 42 L. Ed. 568 (1897)). However, "[a] defendant's subjective perception alone is not sufficient to justify a conclusion of involuntariness in the constitutional sense." *State v. Smith*, 933 S.W.2d 450, 455 (Tenn. 1996). Instead, "'coercive police activity is a necessary predicate to finding that a confession is not voluntary . . . .'" *Id.* (quoting *State v. Brimmer*, 876 S.W.2d 75, 79 (Tenn. 1994)).

At the hearing on the motion to suppress, the trial court determined that Appellant understood his *Miranda* warnings. The trial court stated the following:

Based on the testimony of everyone here today the defendant appeared to be under the influence of an intoxicant but there were many questions asked, sometimes numerous times that he was able to understand and he asked – he gave his name. He understood. He told where he had been. When the question was asked, how much have you had to drink, he gave an appropriate response, whether it was accurate or not, I had X number of beers. He remembered having an accident. He didn't know exactly what town he was

in but he knew he did not have a license because of his driving under the influence conviction, knew of those. Knew that his child was with him and could not think of the other person. So I think based on the totality of the circumstances, what he knew, what he didn't know, the defendant was able to give consent for the blood test and was able to understand his *Miranda* rights.

The record supports the findings of the trial court. The officers testified that Appellant was intoxicated, but he was responding appropriately to the majority of the questions they posed. Appellant has not shown that the evidence preponderates against the findings of the trial court that he understood his *Miranda* rights.

Therefore, this issue is without merit.

Suppression of Blood Alcohol Results

Appellant argues that the trial court erred in denying his motion to suppress the test results from the blood alcohol test because he did not have the capacity to consent to the extraction of his blood because of his level of intoxication.

Appellant bases his argument on Tennessee Code Annotated section 55-10-406(e) which provides that the results of a defendant's blood alcohol test may be admissible in criminal prosecutions for aggravated assault or vehicular homicide when the defendant's blood was "obtained by any means lawful," even when the defendant did not consent to having his blood withdrawn. *See State v. Huskins*, 989 S.W.2d 735, 738 (Tenn. Crim. App. 1998) (stating that subsection 55-10-406(e) addresses "the admissibility of otherwise lawfully obtained test results where the sample was not voluntarily taken, i.e. when the defendant refuses to submit voluntarily to testing or when the defendant is unconscious or otherwise incapable of rendering consent at the time the sample is drawn").

However, this statute is not applicable to this case. Appellant was not unconscious and did not refuse to submit to the blood alcohol test. Appellant argues that he was too intoxicated to consent. However, as noted above with respect to Appellant's statements, the trial court determined that despite Appellant's intoxication, he was able to understand his rights and to voluntarily and knowingly waive them. The evidence does not preponderate against the conclusion that Appellant voluntarily consented to a blood alcohol test.

<u>Re-Mirandized</u>

Appellant argues that the trial court erred in denying his motion to suppress Appellant's statements and holding that Appellant did not need to be "re-Mirandized" between statements he made at the scene of the wreck and the statement he made at the hospital.

In *Wyrick v. Fields*, 459 U.S. 42, 103 S. Ct. 394, 74 L. Ed. 2d 214 (1982), the United States Supreme Court decided against instituting a rule to require law enforcement to re-advise a suspect of his Miranda rights when there has been a break between bouts of questioning. The Court stated that such a rule would be "an unjustifiable restriction on reasonable police questioning." *Id.* at 49. Therefore, when a defendant makes a valid waiver of his Miranda rights that waiver remains valid unless the circumstances change requiring a new advice of rights. The circumstances must change to such an extent that the suspect's answers to police questioning are no longer voluntary or he is no longer making a knowing and intelligent waiver of his rights. *Id.* at 47. Appellate courts must examine the totality of the circumstances to determine whether renewed warnings are required. *Id.* at 48.

The following factors have been put forth for consideration when an appellate court assesses the totality of the circumstances: 1) the amount of time that has passed since the waiver; 2) any change in the identity of the interrogator, the location of the interview, or the subject matter of the questioning; 3) any official reminder of the prior advisement; 4) the suspect's sophistication or past experience with law enforcement; and 5) any indicia that the suspect subjectively understands and waives his rights. *See People v. Mickle*, 54 Cal.3d 140, 284 Cal. Rptr. 511, 814 P.2d 290, 305 (1991). This list of factors is not exhaustive because there is an infinite variety of circumstances that may be presented. Also, the weight given to different factors will vary depending on the particular facts of the case.

Tennessee cases have upheld the admissibility of statements made the day after administration of *Miranda* warnings. *See Reaves v. State*, 523 S.W.2d 218, 220 (Tenn. Crim. App. 1975); *Mitchell v. State*, 458 S.W.2d 630, 633 (Tenn. Crim. App. 1970). The change in the location of the questioning did not mandate repeated Miranda warnings. *See State v. Aucoin*, 756 S.W.2d 705, 709-10 (Tenn. Crim. App. 1988) (defendant made initial statement at scene following waiver of Miranda rights and then gave subsequent statement at police station without receiving additional warnings); *State v. Pride*, 667 S.W.2d 102, 104 (Tenn. Crim. App. 1983)(defendant made initial statement at scene following waiver of Miranda rights and then gave subsequent statement at police station without receiving additional warnings).

In the case at hand, the trial court stated the following:

> Lastly, I believe that [Appellant's trial counsel] raised the question about being re-Mirandized. This incident did not occur over a lengthy period of time. It did not occur from one day to another. He was not transported from cities to different cities across the state or something like that and so this was all really it appears one event. There was the accident. He ran away. They picked him up. Brought him back. Read him his Miranda Rights. Took him very soon thereafter to the hospital and so I don't find there was any need to be re-Mirandized and also it appears that while Trooper Crain did continue his questioning with the defendant and on occasion the defendant mentioned that his knee was hurting and he needed some help, the defendant evidently was able to respond, was being treated, was in the hospital and the doctor was on his or her way because the doctor came in and I think the response was it was about a 13 minute interview. The doctor finally walks in without having an additional request for him or her to be there and so evidently treatment was in the process and they were just questioning him in between the time that he was checked in and the doctor responded. So I don't find that to be wrong.

Deputy Myers advised Appellant of his Miranda rights and placed him in the patrol car. Appellant was transported to the scene of the accident and subsequently taken to the hospital by Trooper Maynard. About an hour and a half later, while at the hospital, Appellant was questioned for approximately thirteen minutes on audiotape. We conclude under the totality of the circumstances that a subsequent Miranda warning was not necessary. While he was being questioned in a separate place and by new law enforcement officials, the span of time was relatively short and Appellant was in custody of law enforcement at all times. Nothing occurred between Appellant's arrest and his trip to the hospital that would necessitate new *Miranda* warnings.

As in the issues above, Appellant has failed to prove that the facts in evidence preponderate against the findings of the trial court with respect to this issue.

Unconstitutional Seizure

Appellant argues that the trial court erred in determining that the stop of the driver's car in which he was riding constituted an unconstitutional seizure and, therefore, his arrest and any evidence obtained therefrom was fruit of the poisonous tree. The State disagrees.

Both the Fourth Amendment to the United States Constitution and article I, section 7 of the Tennessee Constitution protect individuals against unreasonable searches and seizures by government agents. *See* U.S. Const. amend. IV; Tenn. Const. art. I, § 7. "These constitutional provisions are designed to 'safeguard the privacy and security of individuals against arbitrary invasions of government officials.'" *State v. Keith*, 978 S.W.2d 861, 865 (Tenn. 1998) (quoting *Camara v. Mun. Ct.*, 387 U.S. 523, 528, 87 S. Ct. 1727, 18 L. Ed. 2d 930 (1967)). The Tennessee Supreme Court has noted previously that "[a]rticle I, [section] 7 [of the Tennessee Constitution] is identical in intent and purpose with the Fourth Amendment [of the United States Constitution]," and that federal cases applying the Fourth Amendment should be regarded as "particularly persuasive." *Sneed v. State*, 423 S.W.2d 857, 860 (Tenn. 1968).

Under both constitutions, "a warrantless search or seizure is presumed unreasonable, and evidence discovered as a result thereof is subject to suppression unless the State demonstrates that the search or seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement." *Yeargan*, 958 S.W.2d at 629 (citing *Coolidge v. New Hampshire*, 403 U.S. 443, 454-55, 91 S. Ct. 2022, 29 L. Ed. 2d 564 (1971)); *see also State v. Garcia*, 123 S.W.3d 335, 343 (Tenn. 2003).

One of these narrow exceptions occurs when a law enforcement officer initiates an investigatory stop based upon specific and articulable facts that the defendant has either committed a criminal offense or is about to commit a criminal offense. *Terry v. Ohio*, 392 U.S. 1, 20-21, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968); *Binette*, 33 S.W.3d at 218. This narrow exception has been extended to the investigatory stop of vehicles. *See United States v. Brignoni-Ponce*, 422 U.S. 873, 881, 95 S. Ct. 2574, 45 L. Ed. 2d 607 (1975); *State v. Watkins*, 827 S.W.2d 293, 294 (Tenn. 1992). In evaluating whether the law enforcement officer had reasonable suspicion to justify an investigatory stop, this Court must consider the totality of the circumstances, which includes the personal observations and rational inferences and deductions of the trained law enforcement officer making the stop. *See Terry*, 392 U.S. at 21; *Binette*, 33 S.W.3d at 218; *Watkins*, 827 S.W.2d at 294. Objective standards apply, rather than the subjective beliefs of the officer making the stop. *State v. Day*, 263 S.W.3d 891, 903 (Tenn. 2008); *State v. Norword*, 938 S.W.2d 23, 25 (Tenn. Crim. App. 1996). "An officer making an investigatory stop must be able to articulate something more than an 'inchoate and unparticularized suspicion or hunch.'" *Day*, 263 S.W.3d at 902 (quoting *Terry*, 392 U.S. at 27). This includes, but is not limited to, objective observations, information obtained from other police officers or agencies, information obtained from citizens, and the pattern of operation of certain offenders. *Id.*; *Watkins*, 827 S.W.2d at 294 (citing *United States v. Cortez*, 449 U.S. 411, 418, 101 S. Ct. 690, 66 L. Ed. 2d 621 (1981)). A court must also consider the rational inferences and deductions that a trained police officer may draw from the facts and circumstances known to him. *Terry*, 392 U.S. at 21.

The trial court made the following findings at the hearing on the motion to suppress:

> I think under the circumstances the stop was extremely appropriate. Any time you have a serious crime that appears to have just been committed, your information is that someone is running from the scene, you get a description, it's late at night in a rural part of the county and you see a car stopped on a rural road with someone getting in the vehicle then the vehicle pulling slowly away, I think you have every obligation as a law enforcement officer to conduct a brief investigatory stop to see if that person is there. Otherwise, if somebody runs away as soon as they leave the scene, you can't look for them unless you actually see that person specifically up close. That would be terribly difficult to investigate crime. So I think the stop was valid . . . .

We conclude that Appellant has not demonstrated that the evidence preponderates against the findings of the trial court. Officer Myers was charged with the task of locating the driver of the white Blazer late at night. He was given a description. As he was searching, he noticed a car stop on a deserted country road and saw someone get in the car. Under the totality of the circumstances, we conclude that the officer had a reasonable suspicion to justify an investigatory stop. *See id.*

Therefore, this issue is without merit.

### Expert Witness

Appellant argues that witness Trooper Johnny Farley, who testified as an accident reconstructionist, did not have the necessary qualifications to testify as an expert witness. Appellant argues that the trial court erred in denying his motion to exclude Trooper Farley's testimony. The State argues that there was no abuse of discretion on the part of the trial court.

Rule 702 of the Tennessee Rules of Evidence governs the admissibility of expert testimony. It provides:

> If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise.

Tenn. R. Evid. 702.

-17-

Rule 703 of the Tennessee Rule of Evidence provides that:

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing.  If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.  . . . The court shall disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness.

Determinations regarding the admissibility of expert testimony are left to the sound discretion of the trial court.  *State v. Ballard*, 855 S.W.2d 557, 562 (Tenn. 1993).  On appeal, our standard of review is whether the trial court abused its discretion by allowing the expert testimony.  Before reversing the trial court's determination, we must determine that the record shows that the trial court "applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining." *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999) (quoting *State v. Shuck*, 953 S.W.2d 662, 669 (Tenn. 1997)).

Rule 703 of the Tennessee Rules of Evidence contemplates three possible sources from which an expert may base his/her opinion: (1) information actually perceived by the expert; (2) information made known to the expert by others; and (3) information reasonably relied upon by experts in the particular field.  *See* Tenn. R. Evid. 703; *see also* Neil P. Cohen, et. al., Tennessee Law of Evidence §§ 7.03(3), 7.03(4), 7.03(5).  In other words, Rule 703 contemplates that inherently reliable information is admissible to show the basis for an expert's opinion, even if the information would otherwise constitute inadmissible hearsay. *See* Tenn. R. Evid. 703.  It is not uncommon for an expert witness's opinion to be based on facts or data that are not admissible into evidence but are reliable.  *See* Cohen et al., Tennessee Law of Evidence § 7.03(4).

In *McDaniel v. CSX Transportation, Inc.*, 955 S.W.2d 257 (Tenn. 1997), our supreme court addressed the admissibility of scientific evidence under Tennessee Rules of Evidence 702 and 703.  Citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), the court held that evidence and expert testimony regarding scientific theory must be both relevant and reliable before it can be admitted. *McDaniel*, 955 S.W.2d at 265.  The court also listed several nonexclusive factors that trial courts may consider when determining the reliability of scientific expert testimony, including:

(1) whether the scientific evidence has been tested and the methodology with which it has been tested; (2) whether the evidence has been subjected to peer review or publication; (3) whether a potential rate of error is known; (4) whether the evidence is generally accepted in the scientific community; and (5) whether the expert's research in the field has been conducted independent of litigation.

*Id.*

Our review of Trooper Farley's testimony incorporates both his testimony at the hearing on the motion in limine and at the trial. At the hearing and trial, Trooper Farley testified as to his qualifications, training, and the factual bases upon which he formulated his opinions. He stated that he had been assigned to the Tennessee Highway Patrol Critical Incident Response Team for two years. The Critical Incident Response Team is the arm of the Tennessee Highway Patrol that responds to accidents with fatalities and to vehicular homicides. As training for this assignment, Trooper Farley attended Basic Traffic Crash Investigation, Advanced Traffic Crash Investigation, Traffic Crash Reconstruction, Computer Collision Diagramming, Crash Date Retrieval Technician Course, and Crash Data Retrieval Analyst Course. He took these classes at the Georgia Public Safety Training Center, the Tennessee Highway Patrol Training Center, or at L.P.T.M. in Jacksonville, Florida. At the time of the trial, Trooper Farley had completed 50 accident reconstructions. He spends 95% of his time working on crash reconstructions.

Appellant's trial counsel cross-examined Trooper Farley about his qualifications. Trooper Farley stated that he did not have any mathematical or scientific training other than what he had in high school. He agreed that he did not have a college degree. He admitted that Appellant's trial was his first time to testify as an expert. The trial court qualified Trooper Farley as an expert in accident reconstruction.

Appellant argues that Trooper Farley was not qualified to testify as an expert witness. Appellant states the following to support his argument:

In the trial, Johnny Farley testified . . that he did not have any college level classes and did not hav[e] any training in physics, engineering, calculus. Mr. Farley had no mathematical or scientific training other than what he took in grade school. The trial was the first time that Johnny Farley had testified as an expert witness. Mr. Farley had no other training other than a two (2) week training course. Mr. Farley admitted at trial that in the motions hearing that he

could not work through his mathematical formula to calculate speed from memory.

(citations to transcript on appeal omitted).

Appellant has not cited to any authority that requires an expert witness to have the levels of higher education Appellant would require for expert witness or that the expert witness must have previously been qualified as an expert witness. Furthermore, this Court has approved officers with similar qualifications in accident reconstruction. *See State v. Darrell Anderson*, No. W2008-00188-CCA-R3-CD, 2010 WL 1444319, at *23 (Tenn. Crim. App., at Jackson, Apr. 9, 2010), *perm. app. denied*, (Tenn. Sept. 1, 2010); *State v. David L. Davis*, No. 324, 1990 WL 198161, at *2 (Tenn. Crim. App., at Knoxville, Dec. 10, 1990).

Therefore, we conclude that the trial court did not abuse its discretion in determining that Trooper Farley was qualified to testify as an expert in accident reconstruction.

### Admissibility of Photograph

Appellant argues that the trial court erred in admitting a photograph of the accident depicting the victims in the car before their bodies were removed. The State argues that the trial court did not abuse its discretion in allowing the photographs into evidence.

To be admissible, evidence must satisfy the threshold determination of relevancy mandated by Rule 401 of the Tennessee Rules of Evidence. *See, e.g.*, *State v. Banks*, 564 S.W.2d 947, 949 (Tenn. 1978). Rule 401 defines "relevant evidence" as being "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. However, relevant "evidence may be excluded if its probative value is substantially outweighed by . . . the danger of unfair prejudice." Tenn. R. Evid. 403; *see also Banks*, 564 S.W.2d at 951.

Graphic, gruesome, or even horrifying photographs of crime victims may be admitted into evidence if they are relevant to some issues at trial and probative value is not outweighed by their prejudicial effect. *Banks*, 564 S.W.2d at 949-51. On the other hand, "if they are not relevant to prove some part of the prosecution's case, they may not be admitted solely to inflame the jury and prejudice them against the defendant." *Id.* at 951 (citing *Milam v. Commonwealth*, 275 S.W.2d 921 (Ky. 1955)). The decision as to whether such photographs should be admitted is entrusted to the trial court, and that decision will not be reversed on appeal absent a showing of abuse of discretion. *Id.* at 949; *State v. Dickerson*, 885 S.W.2d 90, 92 (Tenn. Crim. App. 1993).

The term "undue prejudice" has been defined as " '[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'" Banks, 564 S.W.2d at 951 (quoting Fed. R. Evid. 403, Advisory Committee Comments). In *Banks*, the Supreme Court gave the trial courts guidance for determining the admissibility of relevant photographic evidence and determined that a trial court should consider, (1) the accuracy and clarity of the picture and its value as evidence; (2) whether the picture depicts the body as it was found; (3) the adequacy of testimonial evidence in relating the facts to the jury; and (4) the need for the evidence to establish a prima facie case of guilt or to rebut the defendant's contentions. *Id.* at 951.

Prior to trial, the State presented six photographs of the accident scene to use at the trial. After viewing the photographs, the trial court determined that only one of the photographs was admissible at trial. The trial court stated that the one admissible photograph was "not overly prejudicial and it does give a pretty good description of the accident and the damage to the car." The trial court did state that "[t]here is severe damage to the car, and there again, they know that there are decedents in the car. People died in the wreck."

Although he photograph in question is of the victims' vehicle before the victims' bodies were removed, we conclude that the trial court did not abuse its discretion in admitting the photograph. It was not overly prejudicial for the jury to see the victim's bodies in the car because the photograph was from a distance and angle such that only one of the victim's heads was visible, there was very little blood and, as stated by the trial court, the jury already knew that the victims were deceased. The State was entitled to show the damage to the victim's car and position of the car as a result of the violent collision of the cars.

Therefore, we conclude that the trial court did not abuse its discretion with respect to the issue.

### Severance of Offenses

Appellant argues that the trial court erred in denying his motion to sever the charge of DUI, fourth offense from the charge of aggravated vehicular homicide. The State argues that the trial court did not err.

Appellant primarily relies on Tennessee Code Annotated section 39-13-218(c) which requires bifurcation of the jury proceedings when a defendant is charged with aggravated vehicular homicide. Tennessee Code Annotated section 39-13-218(c) requires the jury to consider whether a defendant has the requisite number of prior offenses and/or level of blood alcohol concentration necessary for aggravated vehicular homicide "separately" from their deliberation regarding a defendant's guilt of vehicular homicide.

Appellant argues that the fact that the jury was presented with evidence of his blood alcohol level to prove the charge of DUI, fourth offense, violated the provisions of Tennessee Code Annotated section 39-13-218(c). Appellant maintains that this provision prohibits the introduction of evidence of his .21 blood alcohol level in the proceeding to determine whether he is guilty of vehicular homicide which occurs prior to the proceeding where the jury determines whether he is guilty of aggravated vehicular homicide.

This Court has previously addressed this same basic argument in *State v. Carl David Burnette*, No. M1999-2490-CCA-R3-CD, 2000 WL 1681075 (Tenn. Crim. App., at Nashville, Nov. 9, 2000), *perm. app. denied*, (Tenn. May 14, 2001). In *Carl David Burnette*, this Court stated the following:

> Tenn. Code Ann. § 39-13-213(a), in pertinent part, defines vehicular homicide as "the reckless killing of another by the operation of an automobile . . . (1) [a]s the proximate result of conduct creating a substantial risk of death or serious bodily injury to a person; or (2) [a]s the proximate result of the driver's intoxication as set forth in § 55-10-401. For purposes of this section, 'intoxication' includes alcohol intoxication as defined by § 55-10-408 . . . ." Tenn. Code Ann. § 39-13-213(a) (1997). Section 55-10-401(a)(1) makes it unlawful to drive while "under the influence of any intoxicant" and section 55-10-401(a)(2) proscribes driving while "[t]he alcohol concentration in such [driver's] blood or breath is ten-hundredths of one percent (10%) or more." Tenn. Code Ann. § 55-10-401(a)(1) and (2) (1997). Section 55-10-408 allows an inference of intoxication for purposes of proving a violation of § 55-10-401(a)(1) where evidence shows there was .10% or more of alcohol in defendant's blood. Tenn. Code Ann. § 55-10-408(a) (1997). Where applicable, as in this case, the jury must consider the driver's blood alcohol concentration for the crime of vehicular homicide because it is necessary to prove as an element of the offense.

> Aggravated vehicular homicide is a separate offense related to vehicular homicide. The Tennessee state legislature enhanced the penalty for vehicular homicide where the defendant has (1) two or more prior convictions for driving under the influence of an intoxicant, vehicular assault, or any combination of such offenses; (2) one or more prior convictions for vehicular homicide; or (3) at the time of the offense, twenty-hundredths of one percent (.20%) or more of alcohol in his or her blood and also a prior conviction for driving under the influence of an intoxicant or vehicular assault. *See* Tenn. Code Ann. § 39-13-218(a)(1)-(3) (1997). Aggravated vehicular homicide is a Class A felony. Tenn. Code Ann. § 39-13-218(d) (1997). In essence, the

-22-

legislature added an element to the crime of vehicular homicide to make it "aggravated" which can be satisfied in one of the various ways enumerated above. As in the case with vehicular homicide as a result of driver intoxication, it is clear that the jury must find intoxication beyond a reasonable doubt to convict for the aggravated offense under subsection (a)(3) (which requires proof that (1) there was at the time of the offense twenty-hundredths of one percent (.20%) or more of blood alcohol in the defendant's blood and (2) the defendant has one prior conviction for DUI or vehicular assault). Tenn. Code Ann. § 39-13-218(a)(3) (1997). Since intoxication is an element of both vehicular homicide and aggravated vehicular homicide and conviction for the former is a prerequisite to finding guilt for the latter, the jury must consider evidence of blood alcohol levels in both determinations.

Sub-section (c) of the statute for aggravated homicide requires that the jury's deliberations concerning this offense be bifurcated. It states:

> If the defendant is charged with aggravated vehicular homicide, the indictment, in a separate count, shall specify, charge and give notice of the required prior conviction or convictions. If the defendant is convicted of vehicular homicide under § 39-13-213(a)(2), the jury shall then separately consider whether the defendant has the requisite number and types of prior offenses and/or level of blood alcohol concentration necessary to constitute the offense of aggravated vehicular homicide. If the jury convicts the defendant of aggravated vehicular homicide, the court shall pronounce judgment and sentence the defendant from within the felony classification set out in subsection (d) [for a Class A felony].

Tenn. Code Ann. § 39-13-218(c) (1997). Defendant contends that subsection (c) enjoins the jury from considering blood alcohol content in a charge for aggravated vehicular homicide where blood alcohol was previously considered in the underlying charge of vehicular homicide. However, nothing in the statutory language leads to this conclusion.

. . . .

-23-

We therefore interpret § 39-13-218(c) to first require that the jury find a defendant guilty of vehicular homicide under § 39-13-213(a)(2). Subsection 39-13-213(a)(2) states that the level of driver intoxication required for this offense is "set forth in §§ 55-10-401" and includes alcohol "'intoxication' as defined by § 55-10-408 . . . ." "Intoxication" under § 55-10-401(a) is satisfied by proof that a defendant was driving while "(1) [u]nder the influence of any intoxicant, marijuana, narcotic drug, or drug producing stimulating effects on the central nervous system; or (2)[t]he alcohol concentration in such person's blood or breath is ten-hundredths of one percent (.10%) or more." Section 55-10-408(a) allows an inference of "intoxication" sufficient to violate § 55-10-401(a)(1) when evidence is presented that there was, at the time alleged, ten-hundredths of one percent (.10%) or more by weight of alcohol in the defendant's blood. *See* Tenn. Code Ann. §§ 55-10-401, -408 (1997). Clearly, the level of intoxication which satisfies the crime of vehicular homicide is substantially less than that level required for aggravated vehicular homicide. In circumstances where the jury finds a defendant guilty of vehicular homicide, the jury can then be required to separately determine whether the elements are present for the enhanced offense. This involves finding sufficient proof to show that the defendant's blood alcohol level was .20%, again, a significant increase over that level which satisfies vehicular homicide (.10%), in addition to proof of at least one prior conviction for either driving under the influence or vehicular assault. It is entirely plausible that a jury may find proof of blood alcohol sufficient to find guilt of vehicular homicide only. This form of deliberation, which we believe was contemplated by the legislature, requires a second and distinct determination only after the first is completed and the defendant is found guilty.

*Carl David Burnette*, 2000 WL 1681075 , at *7-9.

Therefore, there is no basis upon which to grant a severance of DUI, fourth offense from the charges of aggravated vehicular homicide. To the contrary, the initial proof needed for the DUI, fourth offense charge is also required for the initial proceedings under the statutory required bifurcated proceeding to prove vehicular homicide.

Additionally, Appellant argues that his convictions for DUI, fourth offense and aggravated vehicular homicide violate his protections against double jeopardy. However, the trial court merged the DUI conviction into that of aggravated vehicular homicide. Therefore, there is no double jeopardy issue present in the instant case. *See State v. Rhodes*, 917 S.W.2d 708, 713-14 (Tenn. Crim. App. 1995).

## Limitation of Testimony of Travis Battles

Appellant argues that the trial court erred when it prohibited Travis Battles from testifying about modifications made after the accident to the traffic light at the intersection where the accident occurred. The State argues that the trial court did not err.

The same rules with regard to admissibility of evidence and the determination as to whether evidence is relevant set out above applies to this issue. We reiterate that a trial court abuses its discretion in regards to the admissibility of evidence only when it "applie[s] an incorrect legal standard, or reach[es] a decision which is against logic or reasoning that cause[s] an injustice to the party complaining." *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999) (quoting *State v. Shuck*, 953 S.W.2d 662, 669 (Tenn. 1997)).

At the time of the trial, Travis Battles had been a city alderman from July 7, 2008, through the time of trial. Appellant presented him as a witness at trial. The trial court allowed Appellant to make an offer of proof outside the presence of the jury. Mr. Battles testified that there had been a meeting of the city aldermen on November 3, 2008, in which Mr. Battles requested that the city install strobe lights on all the stop lights along Manchester Highway, which would include the light involved in the accident. The trial court had previously ruled that Mr. Battles could not testify regarding this information. Appellant was allowed to present the witness, and the witness agreed, in front of the jury, that something could have been done to make the light more visible.

Initially, we point out that there was no evidence presented that the traffic light in question was not working properly. Mr. Battles was presented to testify regarding subsequent measures taken by the city to make the traffic light more visible after the accident. This fact that the city attempted to make all the traffic lights on Manchester Highway more visible to drivers does not make it more probable or less probable that Appellant was intoxicated, ran the red light, and collided with the victims. In addition, Mr. Battles testified during the offer of proof that the strobe lights were installed on all the lights on that stretch of road, not just the light at the intersection where the accident occurred. This information does not show, as we assume Appellant is attempting to argue, that the light involved was somehow not visible which was an aberration. Clearly, by installing strobe lights on all of the traffic lights, the alderman was attempting to make all of the lights more visible. We conclude that this evidence was not relevant at trial. There was no abuse of discretion by the trial court in excluding this testimony.

Therefore, this issue is without merit.

**Chain of Custody**

Appellant argues that the trial court erred in admitting evidence about the blood sample because the State did not establish an unbroken chain of custody for the sample. Appellant bases his argument on the fact that the State did not present the testimony of the forensic technician who retrieved the sample from the drop box at the TBI agent laboratory. The State argues that the trial court did not abuse its discretion in admitting the evidence. We agree with the State.

Rule 901(a) of the Tennessee Rules of Evidence provides that "[t]he requirement of authentication or identification as a condition precedent to admissibility [of evidence] is satisfied by evidence sufficient to the court to support a finding by the trier of fact that the matter in question is what its proponent claims." The testimony of a witness with knowledge "that a matter is what it is claimed to be" is sufficient. Tenn. R. Evid. 901(b)(1). Once this foundation has been established, the "trier of fact then makes the ultimate decision of whether the item is actually what it purports to be." Cohen et al., Tennessee Law of Evidence § 9.01[2][a].

This Court has stated, "As a condition precedent to the introduction of tangible evidence, a witness must be able to identify the evidence or establish an unbroken chain of custody." *State v. Goodman*, 643 S.W.2d 375, 381 (Tenn. Crim. App. 1982). The purpose of the chain of custody requirement is to "demonstrate that there has been no tampering, loss, substitution, or mistake with respect to the evidence." *State v. Braden*, 867 S.W.2d 750, 759 (Tenn. Crim. App. 1993). While the State is not required to establish facts which exclude every possibility of tampering, the circumstances established must reasonably assure the identity of the evidence and its integrity. *State v. Ferguson*, 741 S.W.2d 125, 127 (Tenn. Crim. App. 1987). This rule does not require absolute certainty of identification. *Ritter v. State*, 462 S.W.2d 247, 250 (Tenn. Crim. App. 1970). Absent sufficient proof of the chain of custody, however, the "evidence should not be admitted . . . unless both identity and integrity can be demonstrated by other appropriate means." Cohen et al., Tennessee Law of Evidence § 9.01[13][c]. A leading treatise on evidence explains:

> The concept of a "chain" of custody recognizes that real evidence may be handled by more than one person between the time it is obtained and the time it is either introduced into evidence or subjected to scientific analysis. Obviously, any of these persons might have the opportunity to tamper with, confuse, misplace, damage, substitute, lose and replace, or otherwise alter the evidence or to observe another doing so. Each person who has custody or control of the evidence during this time is a "link" in the chain of custody. Generally, testimony from each link is needed to verify the authenticity of the

evidence and to show that it is what it purports to be. Each link in the chain testifies about when, where, and how possession or control of the evidence was obtained; its condition upon receipt; where the item was kept; how it was safeguarded, if at all; any changes in its condition during possession; and when, where and how it left the witness's possession.

*Id.* The issue addresses itself to the sound discretion of the trial court; its determination will not be disturbed in the absence of a clearly mistaken exercise of such discretion. *State v. Beech*, 744 S.W.2d 585, 587 (Tenn. Crim. App. 1987); *State v. Johnson*, 673 S.W.2d 877, 881 (Tenn. Crim. App. 1984). "Reasonable assurance, rather than absolute assurance, is the prerequisite for admission." *State v. Kilpatrick*, 52 S.W.3d 81, 87 (Tenn. Crim. App. 2000).

In the past this Court has examined factual scenarios that are similar to the case herein. In *State v. Terry Scott*, No. E2003-00360-CCA-R3-CD, 2003 WL 22326980 (Tenn. Crim. App., at Knoxville, Oct. 9, 2003), the defendant was convicted of DUI. On appeal, he argued that the State failed to prove a proper chain of custody for his blood sample. *Id.* at *1. The defendant was transported to the hospital in an ambulance from the scene of an automobile accident. The police officer was present at the hospital when the blood was drawn and personally packaged and shipped the sample to the TBI. *Id.* The samples were received by the TBI and logged by an evidence clerk. A special agent with the TBI performed the drug screen. The person who tested the sample at the TBI did not testify. *Id.* This Court determined that the "testimony of [the police officer] and [the TBI evidence clerk] provided the beginning and ending 'links' of the chain. The position of [the technician who tested the sample] was established by [the evidence clerk's] testimony and documented by standard TBI records." *Id.* at *3 (citing *State v. Bobby Wells*, Jr., No. E2000-01496-CCA-R3-CD, 2001 WL 725305 (Tenn. Crim. App., at Knoxville, June 28, 2001), *perm. app. denied*, (Tenn. Oct. 1, 2001) (finding sufficient chain of custody for admission of drug evidence notwithstanding failure of TBI lab technician who received and logged the evidence to testify)). We determined that the testimony introduced along with the fact that there was no evidence of tampering with the blood samples amounted to a proper basis for the admission of the testing. *Terry Scott*, 2003 WL 22326980, at *3.

Additionally, in another case, this Court determined that the trial court properly admitted the results of the blood alcohol test despite the lack of testimony from the hospital employee who drew the blood from Appellant and the testimony from the TBI employee who received the blood sample at the TBI laboratory. *See State v. Michael Joseph Arbuckle*, No. M2000-2885-CCA-R3-CD, 2001 WL 1545494, at *2-3 (Tenn. Crim. App., at Nashville, Dec. 5, 2001), *perm. app. denied*, (Tenn. May 28, 2002). In *Michael Joseph Arbuckle*, the State presented the testimony of the police officer who observed the blood sample being drawn. *Id.* at *3. The officer was responsible for placing the sample in the evidence locker to be

mailed to the TBI. The trial court also heard testimony from the TBI agent regarding the procedure for documenting and receiving blood samples and that there was no evidence of tampering of the blood sample. *Id.* This Court upheld the admission of the blood alcohol test and determined that the State's proof of chain of custody was sufficient. *Id.*

At trial, Lieutenant Maynard testified that he saw River Park Hospital laboratory technician Michelle Young draw a sample of Appellant's blood. Lieutenant Maynard took the sample from Ms. Young and sealed it in a protective box. This sample was delivered by Lieutenant Maynard to evidence custodian, Trooper Carrie Ragland. Trooper Ragland testified that she hand-delivered the blood sample to the TBI laboratory in Nashville.

TBI Agent Jennifer Hall testified that the sample was placed in the drop box at the TBI laboratories. She said that a forensic technician, Shelayla Smith, retrieved the sample from the drop box. Agent Hall testified as to the procedure that the forensic technicians follow as far as having only one sample open at a time. After Ms. Smith retrieved the box and processed the contents, she transferred the blood samples to Agent Hall. After receiving the sample, Agent Hall tested it and concluded that Appellant had a blood alcohol content of .21. She testified that there was nothing unusual about the sample and nothing to imply that the sample had been adulterated.

We conclude that the evidence presented at trial "reasonably assure[s] the identity" of the blood sample. *See Ferguson*, 741 S.W.2d 127. The testimony of Trooper Hunt, Ms. Garrett, and Mr. Harrison has sufficiently shown that the blood sample submitted for testing was Appellant's blood and, therefore, the resulting 0.21 percent blood alcohol level of the blood can be assumed to be the blood alcohol level of Appellant's blood at that time.

### Sufficiency of the Evidence

On appeal, Appellant argues that the evidence is insufficient to sustain his convictions. The State disagrees.

To begin our analysis, we note that when a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. A verdict of guilty, rendered by a jury and "approved by the trial judge, accredits the testimony of the" State's witnesses and resolves all conflicts in the testimony in favor of the State. *State v. Cazes*, 875 S.W.2d 253, 259 (Tenn. 1994); *State v. Harris*, 839 S.W.2d 54, 75 (Tenn.1992). Thus, although the accused is originally cloaked with a presumption of innocence, the jury verdict of guilty removes this presumption "and replaces it with one of guilt." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). Hence, on appeal, the burden of proof rests with the defendant to demonstrate the insufficiency of the convicting evidence.

*Id.* The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *See* Tenn. R. App. P. 13(e); *Harris*, 839 S.W.2d at 75. In making this decision, we are to accord the State "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." *See Tuggle*, 639 S.W.2d at 914. As such, this Court is precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. *State v. Morgan*, 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996); *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Moreover, we may not substitute our own "inferences for those drawn by the trier of fact from circumstantial evidence." *Matthews*, 805 S.W.2d at 779. Further, questions concerning the credibility of the witnesses and the weight and value to be given to evidence, as well as all factual issues raised by such evidence, are resolved by the trier of fact and not the appellate courts. *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990).

Appellant makes no specific assertions as to how the evidence was insufficient. He merely states, "In the case at bar, the Appellant states that the evidence presented by the prosecution is insufficient to sustain the judgments against him in this matter necessitating a reversal of the judgments."

We have reviewed the record on appeal, and after viewing the evidence in the light most favorable to the State, we conclude that the evidence is sufficient to support his convictions.

Therefore, this issue is without merit.

### Sentencing Scheme is Unconstitutional

Appellant argues that the trial court erred in denying his motion to declare the sentence for aggravated vehicular homicide unconstitutional because it constitutes cruel and unusual punishment for an offense that requires reckless conduct as opposed to intentional conduct. The State disagrees.

The court reviews issues of constitutional interpretation de novo with no presumption of correctness given to the legal conclusions of the court below because such an issue is a question of law. *State v. Burns*, 205 S.W.3d 412, 414 (Tenn. 2006) (citing *S. Constructors, Inc. v. Loudon County Bd. Of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001)).

The Eighth Amendment of the United States Constitution prohibits cruel and unusual punishment. With regard to capital cases, the Eighth Amendment requires that the punishment imposed must be proportional to the severity of the offense. *State v. Harris*, 844

S.W.2d 601, 602 (Tenn. 1992). However, "reviewing courts should grant substantial deference to the broad authority legislatures possess in determining punishments for particular crimes; '[o]utside the context of capital punishment, *successful* challenges to the proportionality of particular sentences [will be] exceedingly rare.'" *Id.* at 602 (quoting *Solem v. Helm*, 463 U.S. 277, 289-90 (1983)) (emphasis in original). The Supreme Court has stated, "Severe, mandatory penalties may be cruel, but they are not unusual in the constitutional sense . . . ." *Harmelin v. Michigan*, 501 U.S. 957, 994 (1991) (holding that life without parole for conviction for possessing 672 grams of cocaine constitutional); *State v. Hinsley*, 627 S.W.2d 351, 355 (Tenn. 1982) (finding sentencing provisions of the habitual drug offender act constitutional); *State v. Teresa Fithiam*, No. 03C01-9610-CC-00381, 1997 WL 665988 (Tenn. Crim. App., at Knoxville, Oct. 28, 1997) (upholding statute that imposed a mandatory thirty-day incarceration period for child endangerment); *State v. Danny Lee Holder*, No. 01-C-01-9501-CC-00015, 1996 WL 125905 (Tenn. Crim. App., at Nashville, Mar. 22, 1996) (determining mandatory service of the entire sentence for defendants convicted of rape of a child constitutional).

A mandatory sentence, in and of itself, does not violate the more expansive application to noncapital sentencing by our supreme court of article I, section 16 of the Tennessee Constitution. When considering the constitutionality of a mandatory sentence, we first compare the crime committed to the sentence received. *Harris*, 844 S.W.2d at 603. "Unless this threshold comparison leads to an inference of gross disproportionality, the inquiry ends – the sentence is constitutional." *Id.* However, in the few cases when the inference arises, the court must compare the sentence as applied to other criminals in the jurisdiction and sentences for the same crime in other jurisdictions. *Id.*

In the case at hand, Appellant was under the influence of alcohol, marijuana, and pain killers. He drove at an excessive speed. Other motorists testified that they altered their driving because they noticed how fast Appellant was driving. He then ran a red light, according to multiple eye-witnesses, and ran into the side of the victims' car pushing the car out of the intersection and into a nearby ditch. Both victims died as a result of the violent and intense nature of the accident.

Aggravated vehicular homicide is a Class A felony. The range of sentence for a Class A felony is fifteen to sixty years. For a Range I, standard offender, the range is fifteen to twenty-five years. When viewing the facts supporting Appellant's convictions we conclude that a sentence of twenty-five years for the loss of a life is a just sentence. The fact that the statute requires a mens rea of reckless as opposed to intentional does not alter the fact that fifteen to twenty-five years is a proportional and just sentence. Because we find no "gross disproportionality" in the imposition of a twenty-five year sentence for this crime, our inquiry ends here and the sentence is constitutional. *See id.*

Therefore, this issue is without merit.

## Sentencing

Appellant argues that the trial court erred in imposing the length of his sentence as well as ordering his sentences to be served consecutively. The State disagrees.

Appellate review of sentencing is for abuse of discretion. We must apply "a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *See State v. Bise*, 380 S.W.3d 682, at 707 (Tenn. 2012).

In making its sentencing determination, the trial court, at the conclusion of the sentencing hearing, first determines the range of sentence and then determines the specific sentence and the appropriate combination of sentencing alternatives by considering: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts regarding sentences for similar offenses; (7) any statements the defendant wishes to make in the defendant's behalf about sentencing; and (8) the potential for rehabilitation or treatment. T.C.A. §§ 40-35-210(a), (b), -103(5); *State v. Williams*, 920 S.W.2d 247, 258 (Tenn. Crim. App. 1995).

The trial court is still required to place on the record its reasons for imposing the specific sentence, including the identification of the mitigating and enhancement factors found, the specific facts supporting each enhancement factor found, and the method by which the mitigating and enhancement factors have been evaluated and balanced in determining the sentence. *See Bise*, 380 S.W.3d at 705 n. 41; *State v. Samuels*, 44 S.W.3d 489, 492 (Tenn. 2001). Thus, under *Bise*, "[a] sentence should be upheld so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Bise*, 380 S.W.3d at 709-10.

### Length of Sentences

Appellant puts forth his argument regarding the length of his sentence only to his twenty-five year sentences imposed for his convictions for aggravated vehicular homicide. He merely argues that the sentence should be reduced to fifteen years. He does not argue that any specific enhancement factors were improperly applied or that additional mitigating factors should have been applied. He states that his sentence should be reduced.

Because Appellant makes no specific argument that any of the enhancement factors were inappropriately applied, we can only assume that he disagrees with the weight given to those enhancement factors. Aggravated vehicular homicide under Tennessee Code Annotated section 39-13-218 is a Class A felony. The sentencing range for Range I, Class A felony is fifteen years to twenty five years. Appellant's sentence is within the appropriate range and the record demonstrates that the trial court complied with the purposes and principles listed in the statute.

Consecutive Sentences

Appellant also argues that his consecutive sentences were also imposed improperly. He argues that all his sentences should have been run concurrently.

Under Tennessee Code Annotated section 40-35-115(a), if a defendant is convicted of more than one offense, the trial court shall order the sentences to run either consecutively or concurrently. A trial court may impose consecutive sentencing upon a determination that one or more of the criteria set forth in Tennessee Code Annotated section 40-35-115(b) exists. This section permits the trial court to impose consecutive sentences if the court finds, among other criteria, that:

> (2) The defendant is an offender whose record of criminal activity is extensive;
>
> . . . .
>
> (4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high; . . . .

T.C.A. § 40-35-115(b)(2), (4). When imposing a consecutive sentence, a trial court should also consider general sentencing principles, which include whether or not the length of a sentence is justly deserved in relation to the seriousness of the offense. *See State v. Imfeld*, 70 S.W.3d 698, 708 (Tenn. 2002). The imposition of consecutive sentencing is in the discretion of the trial court. *See State v. Adams*, 973 S.W.2d 224, 230-31 (Tenn. Crim. App. 1997).

Once again, Appellant puts forth no argument specifying in what way the trial court erred in imposing consecutive sentences. The trial court based the imposition of consecutive sentences on factor (2), "the defendant is an offender whose record of criminal activity is

-32-

extensive, . . . " and (4), "the defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high; . . . ."

As stated above, this section also permits the trial court to impose consecutive sentences if the court finds, among other criteria, that "the defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high." T.C.A. § 40-35-115(b)(4). However, before ordering the defendant to serve consecutive sentences on the basis that he is a dangerous offender, the trial court must find that the resulting sentence is reasonably related to the severity of the crimes, necessary to protect the public against further criminal conduct, and in accord with the general sentencing principles. *See State v. Imfeld*, 70 S.W.3d 698, 708-09 (Tenn. 2002); *State v. Wilkerson*, 905 S.W.2d 933, 938-39 (Tenn. 1995).

In the case at hand, the trial court did not make the requisite findings to apply consecutive sentencing based upon Appellant being a dangerous offender. However, only one factor needs to be present to support consecutive sentencing.

At the time of the accident, Appellant was twenty-three. Between the ages of seventeen and twenty-one, Appellant had two weapons offenses, three convictions of driving under the influence, two convictions of underage drinking and possession of alcohol, one conviction of driving with a suspended license, and two violations of probation. We agree with the trial court that this is an extensive criminal history for such a young defendant. This record demonstrates that Appellant has a clear disregard for the law. We conclude that this is sufficient proof of extensive criminal activity to support the imposition of consecutive sentences.

**Miscellaneous Evidence Arguments**

Appellant's final argument is that the trial court erred in overruling several objections to the introduction of various pieces of evidence both during pretrial and trial. With regard to all of his assertions he argues that the trial court erred in determining the evidence's relevance. He additionally argues that all the errors together cumulatively affected the judgment. The State argues that the trial court did not err.

The Tennessee Rules of Evidence embody, and our courts traditionally have acknowledged, "a policy of liberality in the admission of evidence in both civil and criminal cases . . . ." *State v. Banks*, 564 S.W.2d 947, 949 (Tenn. 1978); *see also State v. Robinson*, 930 S.W.2d 78, 84 (Tenn. Crim. App. 1995). To be admissible, evidence must satisfy the threshold determination of relevancy mandated by Rule 401 of the Tennessee Rules of

Evidence. *See, e.g.*, *Banks*, 564 S.W.2d at 949. Rule 401 defines "relevant evidence" as being "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. However, relevant "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . ." Tenn. R. Evid. 403; *see also Banks*, 564 S.W.2d at 951. The determination of relevancy is left to the discretion of the trial court, and this Court will not overturn a trial court's determination in this regard in the absence of an abuse of discretion. *State v. Forbes*, 918 S.W.2d 431, 449 (Tenn. Crim. App. 1995).

Appellant argues the following: (1) that testimony that the victims' great-grandchildren could have been in the car during the wreck should have been excluded as irrelevant; (2) that testimony about the number of empty beer cans and pop-tops in Appellant vehicle should have been excluded as irrelevant; (3)Appellant's response of "I don't give a fuck" when told he killed two people should have been excluded as irrelevant; (4) Appellant's testimony that he believed that the light was green when he went through the intersection should not have been excluded as irrelevant. After thorough review of the record, we conclude that there was no abuse on the part of the trial court in its decisions regarding these pieces of evidence. As stated above, we must find an abuse of discretion to overturn a trial court's determination of relevancy. Therefore, we find no basis to overturn the trial court's determination.

Furthermore, because we have found no error we find no cumulative error sufficient to overturn the judgments.

## CONCLUSION

For the foregoing reasons, we conclude that the judgments of the trial court are affirmed.

_____
JERRY L. SMITH, JUDGE